Ms. Martin. Good morning. Christian Martin of Davis Cowell & Boe representing the petitioners. I'd like to reserve five minutes of my time for rebuttal. The National Labor Relations Board decision in this case is inconsistent with the clear language of the National Labor Relations Act. Section 8A1 makes it an unfair labor practice for employers to, quote, repeatedly describe interference as a key prescription of Section 8A1. In this case, the managers literally interfered with employees as they were exercising their rights to self-organization. I think we know what the facts are, but I have a question. Is there any evidence that Ms. Sapien threatened, forced, or used a promise of benefits in the exchange and also Ms. Brand? No, we have no objection to the words that were said by either of the two managers when they interjected themselves into the conversations. The issue is whether the act of interjecting and taking over the conversation so the employees couldn't continue on with their private conversation about whether they wanted to unionize. Well, in both of the people, in both of the interactions, the people ultimately signed the card, right? You know, I don't know that there's evidence of when they ultimately did or not. And that's something the board wouldn't allow in because of privacy concerns. I don't know that it was even asked specifically. Well, I think I know that, so why would I know that? Okay. You may be right. If, you know, maybe we can ask on the other side, but for some reason I know that. Okay. And so if let's assume just for the moment that it is in the record that they both signed the cards, then if there was whatever happened wasn't successful, right? Well, but that's correct. But the issue or the board law is very clear that whether an unfair labor practice occurs doesn't turn on whether the manager was successful or unsuccessful in dissuading employees from joining the union. There's very clear case law of that. Well, here's what I'm concerned about. Obviously, you prevailed on a number of issues. And on these two, I think even the ALJ said that they weren't that aggravated, and then you lost in front of the board on these two issues. Now, obviously, I think the people both, I don't think that there's evidence in the record that the people went to this location to have these encounters, that these were places that they went. It's correct that they boarded up. I mean, the venue. It's not as if, say, I'm in my office and I see someone across the street and I recognize them doing some union things and I decide, okay, I'm going out. I don't have other business in the cafeteria. I mean, here they eat in this cafeteria or they do that. And so it seems to me that what you're arguing on some level, it's subjectively how these people feel as opposed to the actual conduct. And so that if we are to buy your argument, won't everything be a surveillance? No. I mean, when can anyone, you know, you talk about when can anyone ever say anything. These people have a certain amount of rights to say what their view is. They didn't go there with the concept to express that view. They happened to be there eating or whatever. They see something going on. They involve themselves. And what you said at the end is exactly the issue. Our objection isn't that they were in the employee cafeteria. They do that every day. That's undisputed. Our objection is that they don't normally interact with employees, have lunch with employees, converse with employees about whatever topic. And when they saw employees signing union cards, they went over those tables and they took over those conversations. Now, employers. They didn't take over the conversations. They were there for a limited period of time and then they left. And they didn't hang around to listen to what the conversation would be after they left. They didn't in any way try to influence what the conversation would be after they left. It was a limited interface that in a place where all the parties involved would normally be. And if they went to say is the vegetable soup better than the bean soup today, would that be an interruption if they had never before asked about the quality of the soup? I would say if they normally never interact with employees, if these managers, you know, come into the cafeteria, eat their own lunch, but interact among themselves and never sit down and converse and chat about whatever topic with employees, then the fact that they approached this table and had this conversation because they saw employees signing union cards and they wanted to put a stop to it is, and I would say the wanted to put a stop to it isn't required here because motive is not an element in Section 8. Okay. But that can't be right. If any time, if you've never had a conversation with someone, but then you have a conversation with them that you automatically have surveillance, that can't be right. If they went over to the table because union cards were being signed and they started a conversation in order to prevent employees from continuing the conversation, the natural effect was to prevent employees from continuing their conversation about whether they wanted to sign the cards. Yes. And I would refer the Court to the, one of the Board's cases we cited involved questions, managers went over to employees who were conversing with organizers and they started a conversation. All right. Let's see. Is the test objective or subjective? It's an objective test. All right. And let's say that the Board found that objectively that the behaviors were not such, but then you come back with, and I think the employee said, even though they may have signed the cards, which I think they did, so it didn't have that effect, but they felt intimidated, even though there wasn't a threat, even though there wasn't that. So it seems to me that you're trying to insert a subjective factor to it, and I don't know how that would be manageable as a rule when you're weighing that employers have a right to have certain views and express them, and if they don't combine them with the conduct that makes it surveillance, even though your clients felt that they were being interrupted. It wasn't just that our clients felt they were being interrupted. Objectively they were being interrupted.  In one of the instances, the employees then started to speak to each other in Spanish, or one employee started to speak to the others in Spanish, and the manager said, what are you saying? So what if someone is just telling a lie right there and you're standing there? You know, you went to have your lunch and you hear someone, you know that someone is a Spanish speaker and you're concerned that they're being lied to or that they're being tricked because they don't speak that language. Are they not allowed to do anything about that? They have all the time in the world once the break time ends to speak to the employees. They can speak to employees while they're working. They can hold mandatory meetings on paid time. They can give employees mailings to their homes. They can put notices in their paychecks. They can put notices on the bulletin board to explain their views.  What we're saying here is the fact that this interruption took place on employees' private personal time, their break time. In an area and time that the Supreme Court has said is the ideal time for employees to engage in union activity in the workplace and that they have a protected right to do. These employees weren't doing anything that would call attention to themselves like, you know, having a cafeteria rally or making speeches or passing out leaflets. They were sitting privately at a table and conversing. And the managers don't ordinarily sit with them or interact with them at all. And those are the facts that we believe lead to a conclusion that this was objectively, you know, interference. Let's suppose that the employees have been talking about baseball and we have essentially the same conversation. Management comes over and talks to them about the fact that the management doesn't believe a union should be organized. Any problem with that? No, because there there's no interference with self-organization. Self-organization isn't occurring. So, I mean, it really just comes down to whether it's interruption at least and then this particular problem I think you have in your case. In contrast with some of the other cases on the board, this was an open cafeteria where management and labor had joint meals and so forth. What's your reaction to that? How can you have surveillance in essentially a public place? Because there's a difference between surveillance and interference. And the essence of your case is surveillance. So tell me how you believe you can have surveillance in such a public place. Well, first of all, surveillance, a lot of the board's cases involving surveillance occur in public places. But our argument here is this wasn't surveillance in the sense of observation, much less surreptitious observation. This was... Nobody was around with binoculars or electronic eavesdropping. And we don't have any objection to the moments, the time that the manager spent watching what occurred before they went over and interrupted the conversation. The objection here, the unfair labor practice here occurred when they interrupted the conversation and interjected themselves into it and directed the flow of conversation toward subjects that they wanted to discuss, why employees should not unionize. So that's the surveillance here. But plenty of the board's cases arise in public places. And what the board says is, well, is the conduct out of the ordinary? We understand managers might in the course of their day observe employees or talk to employees. But is the conduct here out of the ordinary? And the facts are undisputed that managers do not ordinarily talk to employees in the employee cafeteria. There's no evidence in the record that this was a routine type of interaction. And I'm not even focusing on the subject matter, but just the interaction itself. Is there any evidence in the record that Aladdin Management gave Ms. Sapien or Ms. Brand instructions to interrupt? No, but Ms. Sapien was the head of the Human Resources Department. So she was one of the very high levels. I don't know who would instruct her. Well, but there's no evidence that someone higher up did. And there's no evidence that they went there with the idea they were going to have that conversation. The evidence, I mean, you could objectively assume that they went there for lunch. They went to the cafeteria for lunch. They went to the tables once they saw union cards being signed. I think we have your argument at hand. Do you want to save some time for rebuttal? Sure. Very good. Thank you. Good morning, Your Honor. David Seid for the Labor Board. The union concedes that surveillance only occurs when an employer observes union activity in a manner that's out of the ordinary, and that here the company did not engage in surveillance when it observed the open union activity in the cafeteria, nor did it engage in surveillance simply by having a conversation with the employees, which was protected language under the Act. Instead, it focuses on the interruption. Well, that's the case, isn't it? I mean, everybody pretty much agrees that management can watch the employees in the lunchroom, that management has a right to talk to them. The only question is whether or not when union organizers are there talking with potential union members, management can come and interrupt the conversation. Isn't that it? That's correct. The sole argument is that because managers can typically speak to the employees in the cafeteria and that here they did have a brief conversation, that made it out of the ordinary and therefore surveillance. The Board reasonably rejected that argument. It looked at the types of cases where it has found conduct to be out of the ordinary, and that here, again, somebody wasn't being followed around from table to table. Somebody didn't show up at the conversation, just cross their hands and say, I'm not leaving, which is what has happened in the types of cases where the Board has found unlawful surveillance. Instead, given that this was simply a fortuitous situation of managers walking right into union activity taking place right in front of them with cards out in the open table, that if it's perfectly acceptable and appropriate for the managers to stand there and observe the activity, for the employees to know that they're being watched and likely being heard, that it's not going to be an out of the ordinary context for the managers to simply open their mouth and say language that is completely lawful. And the situation involving Sapien is particularly instructive, because there you have a situation where the two union committee men are having, two union committee women, excuse me, are having lunch. They're wearing union buttons. They're sitting down at the table. They see some employees sitting at a table next to them. They ask those employees, can we talk to you about the union? They start engaging in a conversation. Sapien is walking through. She gets within about three feet of them. The employees are fully aware that they're being observed. That's perfectly okay. And then Sapien simply says, hey, do you understand some of the things as to what you're doing and what you're signing? And the idea that they simply took over the conversation, I would point out to the Court that the employee in that situation involving Sapien openly acknowledged why she was thinking about signing a union card, and that there was an exchange about benefits. And she stated that she was doing it for better benefits. And there was an exchange as to what the union may or may not be able to get as far as better benefits and how the negotiating process works. And with respect to Felix. Is it part of the record whether these people signed union cards? To the best of my recollection, I believe the union committee person testified that they weren't deterred. I don't believe the record actually states whether or not they did sign cards. And certainly we do know that the two managers in both situations didn't leave. They did not stay to see whether or not cards got signed. Well, how much deference do we give the Board's decision in this case? Your Honor, it is reviewed under a substantial evidence standard. And here on the particular facts of this case, there certainly is substantial evidence to support that opinion, that decision. How much deference does the Board give the ALJ? What's the standard? When the Board simply draws different inferences from the facts where it's not reversing credibility or anything like that, which it didn't do here, then the Board doesn't give necessarily any deference to the administrative logic of this decision. And this Court's review is still a substantial evidence test when the Board and the administrative logic disagree. Unless, again, it was for credibility purposes, which did not take place here. I think orbit light speed was one of the cases that was talked about. And what factors led the Board to conclude that there was unlawful surveillance in that case? And how do we relate that to this case? Sure. There's two points with respect to that case. First on the facts, it's not clear in the situations where the managers interfered with the unit activity whether or not those managers were on break. I'm sorry, I didn't hear that. It wasn't clear what? It's not clear whether when the managers interfered with the unit activity whether the managers were on break. We do know that there were some situations where they observed unit activity when they were on a smoking break, and that was found to be lawful. And in the situations where they then actually interfered with the unit activity, it's not clear whether or not they were on break. And also the interaction there was very different. It often ended up in name calling and disbanding whatever activity was taking place. On a more broader note, there's simply no indication in that case that the board was ever presented with the question it was presented with in this case, and that was to balance out an employer's lawful Section 8C right to talk about unionization, as long as it doesn't say anything unlawful, versus the employees engaging in union activity and to balance out that right. And so there's simply no ---- Why does that make any difference? That's what the board's holding was. You presume that they were well aware of the law, right? I mean, it's a long opinion, I'd say. Your Honor, there's simply no way of knowing what the employer's objections might have been to the board in that case and what specifically the board considered. There certainly was no discussion of Section 8C in that case in the board opinion. It merely upheld the Administrative Logistics decision, which also did not get into any Section 8C discussion like the board did in this case. And that essentially leaves the union asking for a per se rule. And certainly the board could adopt a per se rule whenever there's an interruption. Given the Section 8C right for an employer to talk to its employees, the board reasonably declined to do so here. And the board typically acts on a case-by-case basis, and it was certainly reasonable to do so here. So what you're saying is that what they're asking for, and this is what I was trying to ---- if we accept petitioner's arguments, then it would be a per se rule that any time a manager went over and a conversation was going on about the union, then that would be surveillance? As board counsel understands the union's argument, that it's okay to get within two or three feet for the employees to know that they're being observed, but you just simply can't open your mouth. I thought the argument was it depended on whether or not it was out of the ordinary. And if it were ordinary for management to sit down and converse, it would have been a different matter. But management didn't interact with the employees in this case. It's not a per se rule. It's a question of ordinariness, ordinary behavior, right? Your Honor, it's an objective test that the activity needs to be observed in a manner that's out of the ordinary. And again, the board is assuming here, though arguments can be made that that's not necessarily the case, but they assume that it wasn't typical for the managers to speak to the employees in the cafeteria. Well, it is undisputed that this was not ordinary conversation, that the human resources ---- I mean, that's given, isn't it? That's correct. I mean, the assumption was made that that was, but again, the board looked at the types of cases and what is it considered objectively to be out of the ordinary conduct. The obvious one is taking pictures or writing down names, being in the cafeteria in the first place when you're not normally there, following people from table to table, just sitting down at the table for the entire lunch hour or telling people, gee, I see you're signing union cards, so I'm just going to stand here and see if you sign them or not. But that's the type of observation that would be considered out of the ordinary. And simply because something doesn't take place on a daily or weekly basis doesn't automatically ---- Well, it didn't take place ever, though, did it, in this record? I mean, that's the puzzle I have on this case. And in listening to you, it seems to me that you're making ---- you're arguing for basically an ad hoc standard that would be almost impossible to apply on a recent basis. You're implying that if she'd stayed around to see whether the union cards got signed or not, that would be ---- that would cross the line. But if she left after interrupting and saying, don't sign the cards, that's okay. It's hard for me to draw a distinction between those two. Your Honor, it does depend on the total circumstances and facts of the case. But what are our guideposts in reviewing that? I mean, aside from substantial evidence, what are our guideposts? How long is too long? How long is ---- I mean, I ---- Your Honor, I can understand the Court's concern because there are no flat rules. You can look at cases where maybe too long is five minutes. There can be other cases where too long is half an hour. It all depends on the broad framework and context of what's going on. And then in this particular case, when the employees ---- when the managers are simply walking through, the activity is taking place right in front of them. There's cards spread out on the table. And it's perfectly acceptable for those managers to stand there, to observe the activity, for the employees to know they're being observed, and to simply open their mouths and to say speech that is acknowledged to be protected, that that's not going to be an out-of-the-ordinary type of situation that the Board is looking for to find surveillance. Now, if there had been threats, that would obviously put this in a different category as well, correct? No, obviously, Your Honor, that's correct. So how do you distinguish Oakwood Hospital and Hawthorne and all those cases? I mean, in Oakwood, there wasn't even a ---- I don't think there was ---- they were just sitting in proximity to the employees, right? In Hawthorne, Your Honor, I believe there was a situation where the managers were never typically in where the employees were eating lunch. And for the first time ---- No, it was sitting at the employees' table, wasn't it, in Hawthorne? And that might have been the one where they switched them from table to table. I apologize, there's a lot of cases with similar facts. I know one of the cases, and I think it might have been Hawthorne, where they followed the employees from table to table, where the employees left, went to another table, the manager followed them, and then the employees actually went out of the cafeteria trying to get privacy, and the employer again followed them. And I believe that was Hawthorne. If I have the wrong case, I apologize. That's all right. But, I mean, the point of some of these cases seems to be, I mean, there's some cases which, well, moving tables was enough to constitute a violation. And it's hard for me to, I guess, to stitch all these together and find consistency in what the Board's doing, given your position today. Because the Board does decide on a case-by-case basis. At times there can be very narrow differences. I apologize. At times there can be very narrow differences. And that's something that the Board, in 60 years of reviewing cases, has given particular discretion to delve into each case and try and sort out whether a violation occurred or not. I think the difficulty, I mean, let's assume that I'm a lawyer for an employer, and I'm advising my client what you can and can't do. It leaves everything wide open. I mean, it's like saying, well, if you sit down there and don't talk, you're violating. But if you go in and seek them out and interrupt them, you're not violating. Those two are kind of irreconcilable. Again, you have a brief discussion that takes place. If it was something where they'd sat down for an entire lunch hour and were just sitting there and standing there and crossing their arms and saying, I'm not leaving until this activity stops or I'm going to see whether you sign cards or not so I know who's signing, that would be a very different situation. That's simply not what happened here. And I can appreciate the Court's concern on similarities, but I would argue that basically the cases here are not similar. But to the extent that there are similarities, it's certainly within the Board's broad discretion to make those narrow distinctions when they do need to be made. Now, Mr. Herman's going to speak, too. How much time? Yes, I believe that Mr. Herman was given six minutes, and I think he's still on target for that. Okay. And I would simply ask that the Court deny the union's petition for review. Any further questions for the Board? Okay, thank you very much, counsel. Thank you. May it please the Court, Your Honors, I'm Brian Herman for Fisher & Phillips for the Intervenor Reorganized AG LLC. So you are an attorney for an employer. How do you advise your client with all these decisions out there? Well, how I would advise my client now, based upon this exchange, is that you've just asked how you reconcile all these cases. The answer is that even though the union has pointed out that, generally, the Board does not look at an employer's motive or the result of the alleged interference or surveillance, the true answer is they really do. And what happens here is, looking at those cases, if the union was truly deterred in its organizing activity or the conversation stopped, that's where the violations are found, and that's not what happened here. So, basically, I think you can do anything in exercising your agency rights so long as you don't stop the conversation, that you don't change the subject. The union cites in its brief Orbit Lightspeed for the proposition that going to talk to the employees about soccer is a violation. Well, how do you do it? I mean, obviously, that's one of the cases they heavily rely on. How do you distinguish this case from Orbit Lightspeed? Well, I would distinguish that holding of Orbit Lightspeed as to the changing of the subject to soccer by saying that the employee, the managers here, Sapien and Brien, did not seek to change the subject. They kept the subject the exact same thing, just gave the employer's point of view, which is exactly what AHC protects. If the employer is not allowed to participate in those types of conversations. I think that's an odd rule to say you can go and change the topic, but you can't go and change the topic, but you can go and say don't sign in the middle of a conversation. That's what the nature of an AHC exchange is, is giving the facts and the opinions and the experiences of the employer or the particular manager in dealing with unions in the past and the way it might be and what the union can and can't promise you. And in the situation in Orbit Lightspeed, the manager went up and said, what are you people talking about? You're talking about the union? I want to talk about soccer. In this situation, it was clear that there was a discussion about the union. The managers went up and they wanted to have the same discussion about the union, just give the AHC protected version of what the employer's view on unionization is. That's exactly what AHC protects. Why isn't that more coercive than interrupting and changing the subject to soccer? I mean, I think the union's point of view, and I know you disagree with it, is that, look, everybody gets a straight shot, but you can't stop us from our organizing activities by interrupting or attempting to intimidate and doing something that's out of the ordinary. Well, it's not out of the ordinary if it's just a simple conversation on the topic that they are talking about. You know, the union has suggested that there are several different ways that employers can discuss the union. They can have captive audience speeches. They can have inserts and paychecks. But those are things that the board has specifically found in the past to be allowed. That doesn't mean that all other forms of AHC conduct are removed. Those are just specific allowances. Is it your position, for example, then, that there's no violation if the employer goes, in this circumstance, goes in the lunchroom, and every time there's a union activity, obvious union activity going on, to go in, interrupt, and give the employer's point of view? I think that's fair to say. And what's happened here is, if you look at the excerpts of the record at page 97, they ask the union committee organizer whether they were deterred from moving on with their conversation after the interruption by Tracy Sapien. The answer was no. I kept continuing to do my job in organizing. And that's what makes this case completely different from Orbit Lightspeed or from Grass Valley Grocery with the arms crossing and staring until the conversation stopped and the employees dispersed. It's not what happened here. But the odd thing to me is, and I appreciate your point of view, because I think that's likely the right answer, but it's hard to say why. I mean, we don't measure the violation by the result. We measure the violation by what happens, by the activity, don't we? Well, it appears in this case that even though the general rule is that we measure by the activity and not by the result, here it does seem that the board is indeed measuring by the result. And whether that's the general rule or not doesn't enter into the employer's logic here, because what the employer has to do is give its opinion, and if its opinion is protected under 8C, then it really should be protected no matter what the circumstances of how the conversation started. Well, is the result, I'm just trying to, is the result an objective factor? See, because obviously from the standpoint I see a subjective factor to saying, well, I felt this way. Well, I see that as unwieldy if we're just going to go, but if the result is that they continued, they were not deterred, they signed the cards, then isn't that part of the objective picture? I think it is. How can that be so? For example, if the management had beaten up the employee and they signed anyway, obviously we would say that's a violation. Well, but that's a different violation altogether. Well, I know, but I'm just saying you have to gauge it by the conduct and not necessarily by the results, although there may be a factor of one might measure the intimidation, I suppose, by the result, but you can carry that to the extreme. Right, but we're talking about surveillance here. We're not talking about other coercive and restraining activity. In defining out of the ordinary, would one consider whether it was a chance encounter in a location where everyone involved went frequently as opposed to an organized campaign to approach people in that area that had not been organized campaign by management to approach employees in that area where that had never occurred before? The employer would posit in this situation that the advent of union organizing activity necessarily changes the way that employers, the way that managers and employees interact, and that's what 8c protects. So does out of the ordinary refer to a different situation than the everyday situation in that site of employment? I think section 8c provides for a new type of ordinary, and this isn't coercive. Is there any case that says out of the ordinary is defined by the organizing situation as opposed to the day-to-day-to-day-to-day activity over the years? Well, there's no case that even says that out of the ordinary applies to interruptions, and that's what we're talking about here. Out of the ordinary applies to surveillance, and to the extent that interruption is being applied to this out of the ordinary standard, the employer would argue that you're looking beyond what the law is already. Is there a difference in the two episodes involved as we look at orbit light speed? The first one, the human resources manager comes over and says, I just want to make sure you get all the information, and walks away. The second one, the conversation is occurring in a different language, and they're asking for translation. To me, there may be a qualitative difference between the two episodes. There may be, but I don't think that's what's at issue in this case. That would be at issue if the union hasn't already conceded that what was discussed was protected by 8c, and what the content of the conversation was. I think the union would agree that in this case, we're not discussing what happens beyond the moment of the initial interruption. All we're talking about in this case is whether the interruption itself was a violation. So if we're to lay this out, your position is management can interrupt any time it wants to in the lunchroom, as long as it sticks to the topic of union conversation. The union's position is you can't interrupt at all, and the board's position is we'll see case by case. Is that where we are? I think that's fair to say. I think what we're saying here is that the employer is free to exercise its views, so long as it doesn't coerce employees. And when an employer exercises its 8c rights, as the union admits that it did, that the interruption itself is not coercive if the conversation that occurs afterwards isn't coercive. Okay. Thank you very much. Any further questions? Rebuttal. Thank you. Let me begin by explaining precisely what the harm is here and then what the union's position is. The harm here is that employees have very limited time in the workplace when they're allowed to engage in organized activity, when they're with their co-workers and they can talk to each other about whether they want to form a union. There's independent unfair labor practice findings in this case where managers told employees, you're not allowed to talk about the union while you're working. One of the employees who was interrupted by manager Stacey Briand, Susana Felix, she was told specifically by her manager a few days earlier, you cannot talk about the union while you're working, even if you can talk about Avon and movies or whatever else you talk about, but you can use your break time in the cafeteria to talk about the union. That's what she did. And then management essentially prevented her from spending her full break time to talk about the union. The union's position is the interruption here is interference because it incurred on employees' break time when employees were engaged in a private conversation, albeit in a public place, but in a private conversation, without inviting managers to join in or anyone passing by to join in. And managers did not ordinarily take up their time. So when can managers exercise their 8C rights? The entire time employees are working, they have all that time to approach employees and talk to them about the union. And, in fact, they do. You'll see if you read the ALJ's opinion that there was a lot of conversations between managers and employees about the union while employees were on work time. Those turned out to be violations, though, right? Some of them did. Some of them didn't. And the conversations that weren't violations obviously weren't litigated. But managers can and do use plenty of employees' work time to talk about the union. You mean like if you work for me, I can just come up to you while you're doing your work and say don't join the union? That's right. And I would say that you could even do it if I was chatting with my co-worker as I flipped hamburgers about why I wanted to have a union. I would say the interruption would be very different there because it wasn't occurring on employees' own time, where the Supreme Court in Republic Aviation has said this is the time that employees can use for organizing and management cannot forbid them to do it. There's no effective difference between a manager making a rule that you cannot organize in the employee cafeteria on your break and a manager dominating your time so effectively you can't do it. Now, just turning to the question of whether the result is a kind of objective factor, that would turn on the particular tenacity of the worker who is being solicited to sign a card. And it would be a win-win situation for the employer. Either you don't commit it until later practice because the employee is tenacious. Well, I'm not saying that it's not determinative, but it seems to me that it's whatever weight you give it. I mean, the person signed the card or they didn't. That's not, I was thinking of signing the card, but I didn't. I mean, if you sign the card and you put that in, that would be something, it's like it would be an objective factor. Now, what weight you would give to it, obviously if a person was beat up as they were signing it, that would be a different situation. But under that rule, if an employee has a 30-minute break, management can use 29 of those minutes as long as the employee has one minute to sign the card. That prevents the employees from having a more in-depth discussion. No, I'm not saying that it tells you what the result is. I'm just saying when you talk about what's objective and what is subjective, it seems to me that that's something that's objective, as opposed to someone talking about what was in their mind. Should Mr. Herman henceforth tell his employer clients, never during break time say anything about the union to your employees because that's a violation? If we win this case, but I would say that if we win, the rule would be if you don't ordinarily chat with your employees about other subjects, you can't then take up employees' time when they're engaging in organizing activities. Okay, but then we're going to have the pretext argument, so then you just start talking to people for a couple of weeks and then you bring up the union the third week. And then you would be arguing, well, that was just pretext. They never talked to them before they heard about that rule. Right. I mean, generally there's a history in workplaces of what goes on and what is ordinary, and that comes up in the cases where the surveillance is observation. Do a manager stand in the parking lot and smoke? And certainly there's factual questions about when the practices began and did it begin when the employer learned of the union organizing drive. But those are all true. Let's carry it a little further. Let's say in this case that the human resources director always ate with the employees and sat down with them. Different case? I think it is a different case. And so these get to be awfully fine distinctions. But I gather your position is that if she had done that, it would have been a different case and that the distinguishing factor is, one, she saw them talking about union activity, and, two, that she interrupted that activity when she normally had not done so before. That's right. Now let me carry it one step further. There seems to be an element in this, although it's not used, that this was a de minimis violation if it were a violation at all. Is that concept within this section? I think this is a very serious violation because of what it means not for these particular employees but for what the rule the board is laying out. And there's a question to the board attorney about what type of analysis the board is doing. I think there's two important pieces of the board analysis. First, I think it's creating a per se rule that employers have this absolute 8C right to express their opinion at any time. There can't be time, place and manner restrictions placed on the expression of those rights. But aren't you also asking for a per se rule? We are asking for a per se rule that employers can't do it in this limited category of time if it's out of the ordinary. I don't know if that's categorized as a per se rule because there's a lot of facts built into it. But we're saying, yes, when employees use their break time for organizing, if managers don't ordinarily talk to them, they can't then join in in private conversations. Do you draw any qualitative differences between the two episodes? Yes. I think that the episode involving the employees that spoke in Spanish goes a step further. I think they're both violations. But the fact that Manager Briand insisted on knowing what the employees were saying to one another when they spoke in Spanish goes a step further to say to employees, look, even if you want to talk to each other, I'm going to stay here and find out what you're talking about. Make sure you're translating what I said as opposed to carrying on your own conversation. One other point I want to make is that the board does not engage in a totality of the circumstances analysis here in this case. It simply sidesteps the question of the interruption altogether. It goes into analysis of why the observation was not an unfair labor practice. But that's not an issue at all. And then it says, well, the employer has an 8C right to express its opinion in almost a per se way. And then it says, well, we're not going to address the interruption because that would be unfair because it was alleged as surveillance. And I don't know if the Court has any questions about that issue in the case. Well, you know, there is an aspect to this where the interruption is the problem, not necessarily the surveillance. I mean, it does because it is a public area. And I would encourage the Court to look at the three cases we're relying on, the Orbit Lightspeed, the Grass Valley case, and the Federal Prescription Services case, which were all cases alleged as surveillance, but the conduct was the interruption. And so the board said that's a form of surveillance, whether it's observing or coming and kind of sitting in on the conversation and taking part in it, that's a form of surveillance. And so that's one point. But then the other point is, is that the issue of what the managers did here in the cafeteria and whether it was ordinary, whether it was ordinary for them to speak with employees or not, was fully litigated. And the board's law and the Ninth Circuit law is very clear that if an issue is not alleged in the complaint but it's fully litigated and there's no surprise to the respondent in this case, then the ALJ and the board can find a violation. The Employers' Council never claimed surprise that the ALJ found a violation based on the interruption when it filed its exceptions. It's like in criminal law. You wanted the lesser included offense. I'm not a criminal lawyer, but that sounds good. Any further questions? All right. Thank you, counsel. The case just here will be submitted. Thank you all for your arguments. It's an interesting issue.
judges: Thomas, Callahan, Roth